IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Capra Dee Amos, #291593, ) | |
| ) | Civil Action No. 6:04-22495-SB-WMC |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Jon Ozmint, as Director of South ) | |
| Carolina Department of Corrections; ) | |
| Richard E. Bazzle, as Warden; Mike ) | |
| Brooks, as Case Worker; NFN ) | |
| Hosinger, as Unit Lt.; NFN Wilke, as ) | |
| Sgt.; Ruth Powell, as RN; A. Enloeh, ) | |
| Nurse; D. Mitchell, as Kershaw I.C.G.; ) | |
| and Mary Williams, as Perry I.C.G., ) | |
| sued in their individual and official ) | |
| capacity, ) | |
| ) | |
| Defendants. ) | |
| ) | |

The plaintiff, a former state prisoner proceeding *pro se*, seeks relief pursuant to Title 42, United States Code, Section 1983. This matter is before the court on the defendants' motion for summary judgment.

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Local Rule 73.02(B)(2)(d), D.S.C., this magistrate judge is authorized to review all pretrial matters in cases filed under Title 42, United States Code, Section 1983, and submit findings and recommendations to the District Court.

The plaintiff filed his complaint on September 28, 2004, alleging that the defendants violated his constitutional rights. On January 12, 2005, the defendants filed a motion for summary judgment. By order filed on January 12, 2005, pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the plaintiff was advised of the summary judgment dismissal procedure and the possible consequences if he failed to adequately respond to the

motion. The plaintiff filed a response in opposition to the defendants' motion on February 8, 2005.

## **FACTUAL BACKGROUND**

This action is premised on events that allegedly occurred during the plaintiff's incarceration at the Perry Correctional Institution (PCI), the Watkins Pre-Release Center (WPC), and the Kershaw Correctional Institution (KCI). The plaintiff claims that while he was working on a road crew in Greenville, South Carolina, he was hit by a car and injured his left knee. He was treated by the PCI medical staff who gave him ibuprofen, an ice pack and crutches and sent him to his dorm. The plaintiff also received a "no work" pass that allowed him to have visitors and to walk around only in the dorm. He claims that defendant Mike Brooks told him if he couldn't work he would be locked in his room and that if he did not want this then he could sign a medical refusal form. The plaintiff refused the "no work" pass.

According to the plaintiff's medical records, he reported to the PCI medical office on November 7, 2003, and stated that he had been hit by a trash can on the left side of his left knee when a car hit a trash truck. He reported that he did not fall down when the trash can hit him, and he walked into the medical office, refusing a wheelchair. Examination of his left knee revealed mild edema but no bruising. The plaintiff smiled and laughed while holding ice to his knee. The nurse noted that he had surgery on his left knee three months earlier to treat a gunshot wound. The plaintiff claimed to have no feeling in his left knee since the surgery. Nurse Enloe also examined his left knee and gave him Motrin and a "no work" pass until November 15, which stated that he could have a visitor, that he could walk only in the dorm, and that his meals were to be delivered to the dorm. The plaintiff refused crutches when he left the medical office. The nurse ordered an x-ray of his left knee.

The plaintiff claims that his "no work" pass was renewed by the medical staff on November 13, 2003, and that defendant Brooks again directed him to his room to be locked

down. According to the plaintiff's medical records, the plaintiff returned to the medical office on November 13 for a follow-up appointment. He stated that his left knee swelled when he walked for a long period of time. It was noted that he walked with a slight limp, and Nurse Enloe noted that his knee had a small amount of edema and full range of motion without pain. She made an appointment for him to see the orthopedic surgeon and extended his "no work" pass until December 1. An x-ray of his left knee on November 14, showed small joint effusion present. The plaintiff told the medical staff that he wanted to return to work because he did not want to be locked down in his room as a result of having the "no work" pass. He requested sedentary work, but his custody level would not allow it. Nurse Enloe explained to the plaintiff that he should not work until he was seen by the orthopedic surgeon but that he could go back to work if he signed a "Refusal of Medical Advice" form. The plaintiff signed the form on November 14 and returned to work.

The plaintiff claims that his "no work" pass was renewed on December 17, 2003, allowing visits and walking around the dorm with crutches. The plaintiff claims that the pass issued on December 17 initially allowed him to have a visitor and to walk in the dorm, but that the pass was changed the next day by the defendant nurses at the request of the defendant correctional officers to say that he could not have visitors and could not walk in the dorm. He also claims that he signed a "Refusal of Medical Advice" form on December 19 to avoid being "locked down." Although the plaintiff filed numerous grievances about being "locked down" and about his "no work" pass being changed, he claims that the defendant grievance staff ignored, refused and improperly handled some of the grievances and that when the defendant grievance staff processed the grievances, they were improperly denied — all of which he claims was in violation of SCDC policy.

According to the plaintiff's medical records, Nurse Enloe saw the plaintiff again on December 17, at which time he complained that his left knee swelled when he pushed the laundry buggy in his job but the swelling went down some with bedrest. He stated that Motrin

3

helped but made him "woozy" and he was in constant pain. He walked into the examining room with a limp. Nurse Enloe examined the left knee, ordered additional medication, issued another 14-day "no work" pass (no yard privileges, bedrest and can have family visit), and issued crutches. She told the plaintiff he could refuse the pass as he did before, but the plaintiff accepted the pass this time.

On December 18, the plaintiff was transferred to the Watkins Pre-Release Center. On December 19, the plaintiff changed his mind and again signed a "Refusal of Medical Advice" form for the "no work" pass. By December 23, the plaintiff wanted the "no work" pass back.

The orthopedic surgeon examined the plaintiff on December 29 and recommended ice on the knee, new medication for pain and swelling, exercises in his room with a band, and follow-up as needed. On December 31, the plaintiff asked for a "no standing, no work" pass. Because the orthopedic surgeon did not order any restrictions, the plaintiff's request was denied.

The plaintiff subsequently was transferred to Kershaw Correctional Institution. He walked into the medical office at KCI with no limp on March 18, 2004, and requested a bottom bunk. Dr. McKinney examined the plaintiff on March 24 and found his left knee stable; he ordered a bottom bunk and a temporary "no prolonged standing and no heavy lifting" pass. These restrictions were no longer in place by March 29.

The plaintiff did not complain about his left knee again until August 13. Dr. McKinney examined him on August 17 and found his left knee stable and with full range of motion. He instructed the plaintiff to use a knee support as needed when walking and to continue treatment per the orthopedic recommendations. The plaintiff also refused to take the prescribed drug Naproxen.

On August 30, the plaintiff reported to a mental health counselor that security personnel had a vendetta against him and SCDC was harassing him because he was trying to sue SCDC. When the plaintiff presented to sick call on September 16 he refused to stand next

to the wall, stating that his left knee hurt. He walked out of the office without being evaluated by the medical staff. The plaintiff signed up for sick call again on September 20 but left again without being seen by the medical staff. On September 23, the plaintiff was evaluated by mental health. He claimed he was not receiving appropriate medical care for his knee injury.

On October 1, the plaintiff presented to the medical office complaining that his knee was swelling. He wanted a MRI. The nurse examined the knee and found some crepitus but no swelling. Dr. McKinney examined the plaintiff on October 8. He noted that the plaintiff was ambulating with ease without a limp and that the plaintiff previously wanted all work restrictions removed but now wanted a limited standing restriction. Dr. McKinney also noted that the plaintiff was uncooperative. He found P-F syndrome in the left knee and prescribed coated aspirin instead of Naproxen. He also instructed the plaintiff to continue to follow the orthopedic surgeon's recommendations. Dr. McKinney believed that the plaintiff's problems with his left knee were secondary to the surgery to treat his gunshot wound and not the result of being struck by a garbage can.

The plaintiff further alleges in the complaint that he made numerous requests for a copy of the accident report from November but the defendants refused to give it to him. When he made Freedom of Information requests in writing to the South Carolina Workers' Compensation Commission, the State Accident Fund and the City of Greenville, he was told each time that there was no record of his "accident." He also alleges that SCDC staff told him that his warden's jacket did not contain any incident reports about him being hit by a car.

Finally, the plaintiff alleges in the complaint that he did not receive medical treatment at the site of the accident, that the incident was not properly investigated by the defendant warden in violation of SCDC policy, and that the defendant nurses refused to examine or treat him prior to changing his "no work" pass.

The plaintiff seeks compensatory damages for his physical suffering, psychological suffering, personal humiliation, mental anguish, fright, shock, and emotional

distress, all of which affect his daily activities, and he seeks punitive damages to deter the defendants from committing similar acts in the future.

## APPLICABLE LAW

Rule 56(c) of the Federal Rules of Civil Procedure states, as to a party who has moved for summary judgment:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. V. Catrett,* 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in her pleadings; rather, she must demonstrate that specific, material facts exist which give rise to a genuine issue. *Id.* at 324. Under this standard, the existence of a mere scintilla of evidence in support of the plaintiffs position is insufficient to withstand the summary judgment motion. *Anderson,* 477 U.S. at 252. Likewise, conclusory allegations or

denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 365 (4th Cir. 1985), *overruled on other grounds,* 490 U.S. 228 (1989). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248. Accordingly, when Rule 56(e) has shifted the burden of proof to the non-movant, he must produce existence of every element essential to his action which he bears the burden of adducing at a trial on the merits.

## ANALYSIS

### *Defendant Ozmint*

In the caption of his complaint, the plaintiff names Jon Ozmint as a defendant and indicates that he is suing him as Director of the South Carolina Department of Corrections. He does not allege, however, that Ozmint was personally involved in or had direct responsibility for the incidents that injured him. Indeed, he makes no further allegation against this defendant. Accordingly, the Complaint should be dismissed against defendant Ozmint.

### *Eleventh Amendment Immunity*

From the caption of his complaint, it appears that the plaintiff is suing each defendant in their individual and official capacities. The Supreme Court has held that neither the State nor a state official acting in an official capacity are "persons" for purposes of actions under §1983. *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71 (1989). The reason is that "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. . . . We hold that neither a State nor its officials acting in their official capacities are 'persons' under §1983." *Id.; see also Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

7

Thus, to the extent that the plaintiff is suing the defendants in their official capacities for money damages, there is no question that they are immune from suit under the Eleventh Amendment. The plaintiff has identified the defendants as state officials. Because state officials acting in an official capacity are not "persons" within the meaning of §1983, the defendants acting in their official capacity are entitled to Eleventh Amendment immunity. *See Will*, 491 U.S. at 71. The plaintiff's claims for damages against the defendants in their official capacities should be barred.

***Deliberate Indifference***

Deliberate indifference by prison personnel to an inmate's health and safety is actionable under 42 U.S.C. §1983 as constituting cruel and unusual punishment contravening the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness. *See Rogers v. Evans*, 792 F.2d 1052, 1058 (5th Cir. 1986). A medical need is "serious" if "it is diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would recognize the necessity for a doctor's attention." *Gaudreault v. Municipality of Salem, Mass.*, 923 F.2d 203, 208 (1st Cir 1990), *cert. denied*, 500 U.S. 956 (1991).

Deliberate indifference may be demonstrated by either actual intent or reckless disregard. *Benson v. Cady*, 761 F.2d 335, 339 (7th Cir. 1985). A defendant acts recklessly by disregarding a substantial risk of danger that is either known to the defendant or which would be apparent to a reasonable person in the defendant's position. *Id.* Nevertheless, mere negligence or malpractice does not violate the Eighth Amendment. *Estelle*, 429 U.S. at 106. Rather, an Eighth Amendment claim is stated by deliberate indifference in the face of pervasive

8

risk of harm or deliberate indifference or callous indifference on the part of prison officials to a specific known risk of harm. *Pressly v. Hutto*, 816 F.2d 977 (4th Cir. 1987).

A claim of deliberate indifference to serious medical needs requires a greater showing than made here, even if it were to be assumed that the plaintiff's medical needs were serious and that a finding of negligence on the part of the defendant could be supported by the evidence. *See Daniels v. Williams*, 474 U.S. 327, 328 (1986); *Estelle*, 429 U.S. at 106. Here, the plaintiff has submitted no evidence at all to support his claims of misdiagnosis or denial of treatment. Rather, his medical records demonstrate that the plaintiff received adequate care and treatment for his problems. There is no evidence that the plaintiff was denied treatment.

The United States Supreme Court has explained:

> Since, we said, only the "unnecessary and *wanton* infliction of pain" implicates the Eighth Amendment, a prisoner advancing such a claim must, at a minimum, allege "deliberate indifference" to his "serious" medical needs. It is *only* such indifference that can violate the Eighth Amendment; allegations of "inadvertent failure to provide adequate medical care," or of a "negligent . . . diagnosis," simply fail to establish the requisite culpable state of mind.

*Wilson v. Seiter*, 501 U.S. 294, 297 (1991) (*quoting Estelle*, 429 U.S. at 104-106) (citations omitted). The plaintiff's claims of misdiagnosis and improper treatment, under these circumstances, are insufficient to establish a violation of §1983.

***Custody and Security Classification***

The plaintiff contends that he was unconstitutionally "locked down" in his room because he had a "no work" pass and because the only way he could get out of "lock down" was to sign a "Refusal of Medical Advice" form. The defendants correctly argue, however, that

> [t]he federal constitution itself vests no liberty interest in inmates in retaining or receiving any particular security or custody status as long as the challenged conditions or degree of confinement is within the sentence in posed and is not otherwise violative of the constitution. Within these limits, so far as the federal constitution is concerned, the security and custody classification of state prison

9

>  inmates is a matter for state prison-official discretion whose exercise is not subject to federal procedural due process constraints.

*Slezak v. Evatt*, 21 F.3d 590, 594 (4th Cir. 1994) (quoting *Hewitt v. Helms*, 459 U.S. 460, 468 (1983) (internal quotations omitted). This court agrees that a change in the condition of a prisoner's confinement, such as "lock down," that does not exceed the scope of the original sentence gives rise to a federally-protected liberty interest only if it "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). Accordingly, this claim is not viable and should be dismissed.

### *Grievances*

The plaintiff alleges that prison officials ignored, refused to process, improperly handled and/or arbitrarily denied his grievances. With respect to these allegations, the court notes that state inmates have "no entitlement to grievance procedures or access to any such procedure voluntarily established by a state." *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir.1994) (citations omitted); *Mitchell v. Murray*, 856 F.Supp. 289, 294 (E.D.Va.1994). "When the claim underlying the administrative grievance involves a constitutional right, the prisoner's right to petition the government for redress is the right of access to the courts, which is not compromised by the prison's refusal to entertain his grievance." *Flick v. Alba*, 932 F.2d 728, 729 (8th Cir.1991); *accord Adams*, 40 F.3d at 72. Assuming the defendants failed to answer some of the plaintiff's grievances, the plaintiff has asserted these claims in this action and obviously has not been denied redress or access to the courts.

### *SCDC Policy*

The plaintiff claims that Warden Bazzle did not properly investigate his "accident" in violation of SCDC policy. He also alleges that there is not a record of his "accident." Indeed,

10

he is unable to produce an accident report from any law enforcement agency. Instead, he has provided a copy of the April 20, 2004, letter from the County of Greenville explaining that the accident report advised that there were no injuries from the collision at issue and does not mention his name at all. Rather, according to the plaintiff's medical records, he reported to the PCI medical office on November 7, 2003, and reported that he had been hit by a trash can on the left side of his left knee when a car hit a trash truck. He reported that he did not fall down when the trash can hit him, and he walked into the medical office, refusing a wheelchair. It is unclear what more an investigation regarding this accident would reveal or how such an investigation would otherwise benefit the plaintiff.

The defendants correctly note that it is well-settled than "[a]n agency's violation of its regulations is not unconstitutional unless the regulations are necessary to afford due process." *Bowens v. North Carolina Department of Human Resources*, 710 F.2d 1015, 1019 (4th Cir. 1983). In the case of *United States v. Caceres*, 440 U.S. 741 (1979), the United States Supreme Court determined that violations of an agency's own guidelines does not necessarily give rise to a constitutional cause of action. The departure from agency guidelines or regulations will only be actionable under 42 U.S.C. §1983 when compliance with the guideline or regulation is mandated by the Constitution.

Even if the defendants had a responsibility to investigate or otherwise review the plaintiff's accident pursuant to SCDC policy, such a policy is not necessary to afford due process and compliance with the policy is not mandated by the Constitution. Thus, no constitutional violation has occurred.

### *Prison Litigation Reform Act*

The defendants also argue that they are entitled to summary judgment because the plaintiff has shown no physical injury and, therefore, is barred from recovery under the Prison Litigation Reform Act of 1996, 42 U.S.C. §1997e(e) (PLRA). This section provides that

"[n]o federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injuries suffered while in custody." This argument has merit.

In his complaint, the plaintiff asks for compensation for the "physical, psychological, personal humiliation, mental anguish, fright and shock, and emotional distress which significantly affect the plaintiffs daily activities" (compl. 9). He offers no evidence and does not allege that the defendants caused him physical injury which resulted in his alleged mental and emotional injuries.

At best, any injuries suffered by the plaintiff were *de minimis* in nature and thus fail to establish the physical injury required before he could maintain an action for emotional or mental distress under the PLRA. *See Siglar v. Hightower*, 112 F.3d 191, 193 (5th Cir. 1997) ("[i]n the absence of any definition of 'physical injury in the new [PLRA] . . . the well-established Eighth Amendment standards guide our analysis in determining whether a prisoner has sustained the necessary physical injury to support a claim for mental or emotional suffering. That is, the injury must be more than *de minimis* . . ."); *Harris v. Garner*, 190 F.3d 1279 (11th Cir. 1999) (joining the 5th Circuit in fusing the physical injury analysis under section 1997e(e) with the framework set forth by the Supreme Court in analyzing Eighth Amendment claims for cruel and unusual punishment and requiring more than *de minimis* physical injury); *Riley v. Dorton*, 115 F.3d 1159 (4th Cir. 1997) (holding that *de minimis* Eighth Amendment analysis applies to excessive force claims brought by pretrial detainees). Thus, the plaintiff's claims for mental and emotional injuries must be dismissed.

***Qualified Immunity***

The defendants have also raised the defense of qualified immunity. Qualified immunity protects government officials performing discretionary functions from suits for civil damages arising out of the exercise of their discretionary functions, provided that their conduct

12

"does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Slattery v. Rizzo*, 939 F.2d 213, 216 (4th Cir. 1991) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982)). The plaintiff's rights must be established so clearly that a "reasonable official would understand that what he is doing violates that right." *Slattery*, 939 F.2d at 216 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 97 L.Ed.2d 523, 107 S.Ct. 3034 (1987)). Accordingly, ruling on a defense of qualified immunity requires "(1) identification of the specific right allegedly violated; (2) determining whether at the time of the alleged violation the right was clearly established; and (3) if so, then determining whether a reasonable person in the [official's] position would have known that doing what he did would violate that right." *Pritchett v. Alford*, 973 F.2d 307, 312 (4th Cir. 1992).[1]

In determining whether the specific right allegedly violated was clearly established, tolerance is accorded in the qualified immunity defense to "'good faith' mistakes of judgment traceable to unsettled law, or faulty information, or contextual exigencies. . . [which] is deliberately designed to give protection to 'all but the plainly incompetent or those who knowingly violate the law.'" *Pritchett*, 973 F.2d at 313 (citing *Malley v. Briggs*, 475 U.S. 335, 341, 89 L.Ed.2d 271, 106 S.Ct. 1092 (1986)).

In addressing qualified immunity, the United States Supreme Court has held that "a court must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Wilson v. Layne,* 526 U.S. 286, 290 (1999); *see also Suarez Corp. Indus. v. McGraw,* 202 F.3d 676, 685 (4th Cir. 2000). Further, the Supreme

---

[1] In order to shield officials from both the burdens of litigation as well as liability, establishment of qualified immunity is encouraged at the summary judgment stage. *Pritchett*, 973 F.2d at 313 (citing *Harlow,* 457 U.S. 800, 815-819). However, summary judgment remains appropriate "only if (1) there are no genuine issues of material fact, and (2) on the undisputed facts the defendant as movant is entitled to judgment as matter of law." *Pritchett*, 973 F.2d at 313 (citations omitted). Thus, it is appropriate to consider the third element of a qualified immunity defense (i.e., whether a reasonable officer would have known that his conduct violated a specific right) only if there are no genuine issues of fact with respect to the official's conduct under the circumstances. If issues of fact do exist, summary judgment is inappropriate, and the issue must be reserved for trial. *Pritchett*, 973 F.2d at 313 (citing *Mitchell*, 472 U.S. at 526).

Court held that "[d]eciding the constitutional question before the qualified immunity question also promotes clarity in the legal standards for official conduct, to the benefit of both the officers and the general public." *Wilson,* 526 U.S. at 609. If the court first determines that no right has been violated, the inquiry ends there, "because government officials cannot have known of a right that does not exist." *Porterfield v. Lott,* 156 F.3d 563, 567 (4th Cir. 1998); *see also Young v. City of Mount Rainier*, 238 F.3d 567, 577-78 (4th Cir. 2001) (where court concluded that the complaint did not allege a constitutional violation, there was no need to consider the question of qualified immunity).

In this case, as set forth above, the plaintiff has failed to demonstrate that the actions of the defendants violated any of his constitutional rights. Therefore, to the extent that the plaintiff is suing the defendants in their individual capacities, the defendants are entitled to qualified immunity on these claims.

## **CONCLUSION AND RECOMMENDATION**

Wherefore, it is recommended that the defendants' motion for summary judgment be granted. All pending nondispositive motions are held in abeyance pending the district judge's disposition of the motion for summary judgment. Should the district judge adopt this court's recommendation, these motions will be rendered moot.

s/William M. Catoe
United States Magistrate Judge

July 26, 2005

Greenville, South Carolina